UNITED STATES DISTRICT COURT
NORTHEASTERN DISTRICT OF TEXAS
DALLAS DIVISION

EXPRESS WORKING CAPITAL, LLC    )
     Plaintiff                    )
                                    )
v.                                  )
                                    )
ONE WORLD CUISINE GROUP, LLC,    )      CASE NO. 3:15-cv-03792-B
ET AL.,                          )
     Defendants            )

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
OPPOSITION TO  PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

*Background.*

This is an attempt by Express Working Capital, LLC ("EWC") to collect its payments,

ostensibly to purchase  "future credit card receivables," but which are loans disguised as

"merchant cash advances," and which the defendants were required to repay at usurious rates by

direct deductions from their credit card deposits, in violation of Chapter 302, *et seq*. of the Texas

Finance Code.  There is no dispute as to the terms of the agreements, euphemistically and

without prejudice described as a Future Receivables Sales Agreement ("FRSA"), Exhibits

APP06 and APP037 to the plaintiff's motion for summary judgment.  Under the 2011 FRSA (Ex.

APP06), One World Cuisine Group, LLC ("OWCG"), received $1,439,780.97 and was required

to repay $1,986,897.94, amounting to interest of $547,116.97.[1]  Under the 2014 FRSA, (Ex.

APP037), Mantra on Newbury received $75,000 and was required to repay $93,750, amounting

to interest of $18,750.[2]

---

[1] The OWCG FRSA provides for a 16% <u>daily</u> percentage of *future receivables*, meaning
that each day the Visa, MasterCard, Discover and Debit Card transactions credited to the
corporate defendants are debited by 16%, which is paid by the processor directly to EWC.

[2] The Mantra FRSA provides for a 15% <u>daily</u> percentage of *future receivables*.

Numerous courts have found those companies making such loans in the guise of

merchant cash advances for the purchase of non-existent future receivables[3] to be engaged in

loan sharking, the interest rate to be usurious and the alleged debts unenforceable.  Addendum 1

is an explanation of how the system works *vis-a-vis* the Clark, et al. v. Advance Me, Inc. class

action settlement in 2011,USDC CAWD, CV-08-3540 (2011).  See, e.g,  *Happy Rock Merchant*

*Solutions v. Libby's Market, et al.*, attached as Addendum 2.

## *Statement of Undisputed Material Facts*

**A.      2011 Future Receivables Sale Agreements, Guarantee, and Breach[4]**

1.  On or about December 28, 2011, EWC entered into an agreement titled "Future

Receivables Sale Agreement" ("FRSA") with Defendants and various other entities, whereby

Defendants and those certain other companies sold $1,986,897.74 worth of future credit card

receivables to EWC for a purchase price of $1,439,780.97 (the "2011 FRSA"). Schmille Aff., ¶3,

Ex. 1; APP. 001, 006017.

Admitted that the 2011 FRSA is authentic, the signatures are genuine and that the

document speaks for itself as to its contents.  The remaining alleged facts and conclusions of law

are DENIED.

---

[3]Contrast with a debt factoring arrangement which involves a business selling its *invoices* at a discount to a factor, which is a specialized third-party finance company. The factor first evaluates the business, to understand how it operates and assesses the receivables to determine *whether they are collectible*. These are key factors when it comes to drawing up the agreement and calculating the discount. **The factor then processes the invoices, collecting the *accounts receivables* from customers.**  Factors purchase existing *third party debt*, not non-existent *first party future sales*.

[4]The section headings are the one used by the plaintiff in its Statement and reiterated for consistency, but they are not intended to be factual admissions by the defendants.

2.  On or about December 28, 2011, EWC performed under the 2011 FRSA by advancing the purchase price of $1,439,780.97 to Defendants. Schmille Aff., ¶4, APP. 001. However, Defendants and Guarantors breached the agreement. Guarantors were liable to EWC for the $1,273,228.60 remaining unpaid by Defendants to EWC under the 2011 FRSA as they unconditionally guaranteed Defendants' performance and obligations under the 2011 FRSA, and contractually agreed to assume full liability for the amount owed to EWC under the agreements. Schmille Aff., ¶4, Ex. 1; APP. 010- 011.

Admitted that On or about December 28, 2011, EWC loaned $1,439,780.97 to One World Cuisine Group, Inc. ("OWCG") and that the other corporate and individual defendants guaranteed the loan.  The remaining alleged facts and conclusions of law are DENIED

**B.     First Settlement Agreement and Breach**

3.  On or about August 29, 2012, following the breach of the 2011 FRSA, EWC, Defendants, and Guarantors negotiated a settlement and entered into a promissory note made by Defendants (and guaranteed by Guarantors) in favor of EWC that established a payment plan on the remaining outstanding amount owed on or about August 29, 2012 (the "2012 Promissory Note"). Schmille Aff.,¶5; APP. 002. In 2013, Defendants breached the 2012 Promissory Note when they missed several payments and made multiple partial payments. Id.

Admitted that the 2012 Promissory Note is authentic, the signatures are genuine and that the document speaks for itself as to its contents.  The remaining alleged facts and conclusions of law are DENIED

**C.     2014 Settlement Agreement and Promissory Note**

4.  On or about May 15, 2014, in satisfaction of the breaches of the 2012 Promissory Note, EWC, Defendants, and Guarantors negotiated and entered into a new and superseding

promissory note (the "2014 Promissory Note") made by Defendants (and guaranteed by

Guarantors) in favor of EWC in the amount of $965,000.00, which included an additional

$150,000.00 advancement. Schmille Aff., ¶116-7, Ex. 2; APP. 002-003, 018-033. The 2014

Promissory Note had a maturity date of May 16, 2016 ("Maturity Date"). Id. at APP. 018. The

Note required Defendants to make fifty-two weekly payments of $6,800.00 beginning on May

15, 2014, followed by weekly payments of $8,200.00 until the 2014 Promissory Note was paid in

full with all unpaid sums being due and payable on the Maturity Date. Schmille Aff., ¶8, Ex. 2;

APP. 003, 018.

Admitted that the 2014 Promissory Note is authentic, the signatures are genuine and that

the document speaks for itself as to its contents.  The remaining alleged facts and conclusions of

law are DENIED

> **D.      Defendants' and Guarantors' Breaches of the 2014 Promissory Note**

5.  Throughout late 2014 and all of 2015, Defendants consistently made partial payments

despite their obligations under the 2014 Promissory Note and EWC's demand for full payment.

Furthermore, Defendants have not made a single payment to EWC since October 29, 2015.

Schmille Aff., ¶¶9-10, Ex. 2, 3; APP. 002-003, 034-036. Defendants and Guarantors have

refused to make any payments to EWC since October 29, 2015 or to pay the remaining

outstanding balance. Id. The current outstanding balance is $662,152.32. Id.

Admitted that from about late in 2014 and in 2015, OWCG made partial payments and

that neither OWCG nor the corporate and individual guarantors have made a payment since

October 29, 2015.  The remaining alleged facts and conclusions of law are DENIED.

**E.      Guarantee by Guarantors of 2014 Promissory Note**

6.  Guarantors are liable to EWC for the $662,152.32 currently owed by Defendants to EWC under the 2014 Promissory Note because they unconditionally guaranteed Defendants' performance and obligations under the 2014 Promissory Note, and contractually agreed to assume full liability for the amount owed to EWC under the agreements. Schmille Aff., ¶11, Ex. 2, 3; APP. 002-003, 018-036.

This is a conclusion of law or of law and ultimate fact which requires no response.  To the extent that a response is required, it is DENIED.

**F.      Mantra 2014 FRSA and Guarantee by Amrik**

7.  On or about October 7, 2014, EWC entered into an FRSA with Mantra, whereby Mantra sold $93,750.00 worth of future credit card receivables to EWC for a purchase price of $75,000.00 (the "2014 FRSA"). Schmille Aff., ¶12, Ex. 4; APP. 004, 037-046. Amrik guaranteed Mantra's performance under the 2014 FRSA. Schmille Aff., ¶12, Ex. 4; APP. 004, 043-044. On or about October 7, 2014, EWC performed under the 2014 FRSA by advancing the purchase price of $75,000.00 to Mantra. Schmille Aff., ¶13; APP. 004. In the amendment to the 2014 FRSA, Mantra represented that its business, Mantra on Newbury, would be open, as defined in the amendment, on or before November 8, 2014 and begin directing payment of the purchased receivables through Mantra's credit card receipts. Schmille Aff. ¶14, Ex. 4; APP. 004, 045-046. Mantra never opened its business. Schmille Aff.115; APP. 004. Mantra never processed any sales through a credit card processor approved by EWC. Id. Mantra has not otherwise satisfied its obligations under the 2014 FRSA except for making a few small sporadic payments, the last of which was received in January 2015. Id. Therefore, Mantra is in breach of the 2014 FRSA. Id. The current Outstanding Balance owed to EWC under the 2014 FRSA is $88,213.36 (the "2014

FRSA Balance"). Schmille Aff. ¶15, Ex. 5; APP. 004, 047. Amrik is liable to EWC for the

$88,213.36 currently owed by Mantra under the 2014 FRSA as he unconditionally guaranteed

Mantra's performance and obligations under the 2014 FRSA, and contractually agreed to assume

full liability for the amount owed to EWC in the event that Mantra did not perform its obligations

under the 2014 FRSA. Schmille Aff. ¶16, Ex. 5; APP. 004, 043-044, 047.

Admitted on or about October 7, 2014, EWC entered into an FRSA with Mantra; that the

2014 FRSA is authentic, that the signatures are genuine and that the document speaks for itself as

to its contents; that on or about October 7, 2014, EWC loaned Mantra $75,000.00; and that the

defendant Amrik S. Pabla guaranteed the loan.  The remaining alleged facts and conclusions of

law are DENIED

*Argument*

**I.  Express Working Capital Is A Lender.**

According to EWC, it purchased non-existent future credit card receivables for the sale of

which intangible the businesses is obligated to repay the amount plus an additional premium by

direct debit of of their *future* daily credit card sales for an *indeterminate* period of time.  It is

incredible in both senses of the word that EWC would make $1.5 million in cash advances with

no predictability of when, if ever, it would be repaid. See *Rewards Network Establishment*

*Services, Inc. V. Monsoon, Inc., et al.*[5]  *Rewards Network*.  As stated by the Court:

> The advance and subsequent repayment of money is the essence of a loan.  See
> Murphy v. Charlestown Savings Bank, 380 Mass. 738, 745 n. 11 (1980). ("loan"
> includes, among other things, "[d]elivery by one party to and receipt by another
> party of a sum of money upon agreement, express or implied to repay it, with or
> without interest" (quoting Black's Law Dictionay 844 (5th ed. 1979).  Id.

---

[5]The plaintiffs apologize that they only know Massachusetts law, but understand that the
principles of what makes a loan and what is usury are the same in Texas.

Nor was the fact that repayment was to be made by a third party of consequence:

> That [recipient] has no personal obligation to repay any of the monies advanced by Stone-Street is also immaterial.  A loan of money made on a non-recourse basis - meaning that the borrower is not liable for repaying the lender and that the lender instead must rely on some collateral, or other assets, or third party obligation - is still a loan. [citations omitted].

Here EWC requires both a cross-collateralized security interest in the restaurant's financial assets and a personal guarantee by its principals.

EWC creatively characterizes its transaction as a purchase.  However, as both a matter of common sense, as the commentator noted in her review of the AdvanceMe settlement:

> One court even stated that it is impossible to sell a hypothetical future interest in possible credit card sales, and thus recharacterized a particular cash advance repaid transaction as a loan instead of a sale.

> The prohibition of the statute embraces every contract or assurance for the payment of money with interest at a greater rate than is allowed by law, irrespective of the motive or intent of the parties in making it. Whatever form or disguise the dealing of the parties may assume, it will be deemed usurious if in effect it is a loan of money at an unlawful rate of interest.  Id. Quoting Sylvester v. Swan, 87 Mass. (5 Allen) 134 (1862).  Id.

**The Interest Rate Is Usurious.**

As above, the *repayment* rate is not the *interest* rate.  Unlike a loan, on which the outstanding balance accrues daily interest, the full amount of the interest is immediately due, which among other statutorily prohibited provisions, creates a prepayment penalty, *i.e,* the interest is owed and must be repaid regardless of when the or how much of the principal is repaid.  For example, if the entire $1,439,780.97 cash advance was repaid in six months, it would be an interest rate of 55%.[6]

---

[6]Contrast with a bank loan, where there is a *daily interest* rate which is 1/365 of the *annual interest rate* and where, if you borrow $10,000 for one month at 18% APR, you owe $150 in interest, not the full $1,180 that would accrue if the principal was outstanding for 12 months.  Similarly, if the borrower pays the bank both principal and interest each month, than the

**Express Working Capital's Loan Sharking Should Not Be Reward.**

Those courts which have considered the collection efforts of companies providing merchant cash advances have uniformly found them to be loan sharking and refused to enforce the contracts.  <u>Clarke</u>, *supra;*  <u>Bistro Executive</u>, *supra;* <u>AdvanceMe, Inc. V. Finley, et al.</u>  275 Ga.App. 415, 620 S.E.2d 655 (GaApp 2005); <u>Transmedia Restaurant Company, Inc. V. Devereaux</u>, 49 N.H. 454, 821 A.2D 983 (SCNH 2003).  EWC has pursued its full amount of interest under the guise of a speculative discounted purchase of future credit card charges, even though it has already been repaid more than that to which it is entitled as a lender, for which reason reformation should not be considered.  With all due respect, usurious lending and unfair collection methods should not be legitimized by turning the shark into a minnow.**Conclusion.**

WHEREFORE, for the foregoing reasons, the defendants oppose the plaintiff's motion for summary judgment.

Respectfully,

<u>   /s/ Amrik S. Pabla     </u>
Amrik S. Pabla, pro se
32 Solomon Pierce Rd.
Lexington, MA 02420
617-262-4770
asinghpabla@gmail.com

Respectfully,

<u>   /s/  Jaswinder Pabla   </u>
Jaswinder Pabla, pro se
32 Solomon Pierce Rd.
Lexington, MA 02420
617-262-4770
 jsinghpabla01@gmail.com

---

daily interest is based on a percentage of the *upaid balance* of the principal amount, not the full amount of principal.  However, the interest on the FRSA remains the same, no matter how much of the principal is repaid or how quickly, which further increases the percentage rate.

## CERTIFICATE OF ELECTRONIC SERVICE

On this date I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5 (b)(2).

Date:  June 23, 2017                                                   */s/ Amrik S. Pabla*
                                                                              Amrik S. Pabla